# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

SECURITIES AND EXCHANGE )
COMMISSION, )
         )
                Plaintiff, )
         )     **Civil Action No.**
    v. )
         )
JEFFREY P. JORISSEN, )
GARY A. SHIFFMAN, and )
MARY A. PETRELLA, )
         )
            Defendants. )

Case: 2:06-cv-10845
Assigned To : Feikens, John
Referral Judge: Pepe, Steven D
Assign. Date : 2/27/2006 @ 8:35 AM
Description: CMP SEC V JORISSEN
ETAL (JLC)

## COMPLAINT

The Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows as to defendants Jeffrey P. Jorissen, Gary A. Shiffman, and Mary A. Petrella:

## NATURE OF THIS ACTION

1.     This action arises out of false financial record-keeping and reporting by a publicly-traded company, Sun Communities, Inc. ("Sun"), from 2000 through 2002. During this period Sun's financial statements failed to properly account for losses resulting from Sun's investment in SunChamp, LLC ("SunChamp"), a joint venture involved in the development of manufactured housing communities. Sun violated generally accepted accounting principles and the requirements of federal securities law by failing to report any of SunChamp's losses during seven quarters, and by improperly underreporting Sun's share of SunChamp's losses in four additional quarters. Sun also maintained an improper general reserve ("cookie jar reserve") and improperly "smoothed" earnings by matching expenses from certain quarters with earnings from

other quarters. Sun's false financial statements were incorporated in documents filed by Sun with the SEC and made available to the investing public, including eleven quarterly reports (Form 10-Q), three annual reports (Form 10-K), and multiple non-periodic filings, including registration statements and prospectuses.

2.      Defendant Jeffrey P. Jorissen, Sun's chief financial officer, initiated and directed Sun's false record-keeping and reporting. Defendant Gary A. Shiffman, Sun's CEO, caused falsifications of Sun's records by providing false information regarding the timing of transactions with outside investors. Defendant Mary A. Petrella, Sun's controller during the relevant period, falsified Sun's records in releasing funds from Sun's cookie jar reserve and improperly matching expenses with earnings.

3.      As a result of defendants' misconduct, Sun overstated its income by approximately $3.6 million (9%) for 2000, $4.6 million (11%) for 2001, and $2.7 million (13%) for 2002.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77v(a)] and Sections 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(e) and 78aa].

5.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails in connection with the transactions described in this Complaint.

6.     Venue is proper in this district because many of the acts and transactions constituting the violations occurred in this district and defendants reside and transact business in this district.

## DEFENDANTS

7.     Jeffrey P. Jorissen ("Jorissen") is Sun's Chief Financial Officer, Senior Vice President, Secretary, and Treasurer.  He has held these positions since 1993. Jorissen is employed at Sun's headquarters in Southfield, Michigan, and resides in Farmington Hills, Michigan.  Jorissen is a certified public accountant.

8.     Gary A. Shiffman ("Shiffman") is Chairman of the Board of Directors, Chief Executive Officer, and President of Sun.  Shiffman has been on the Board of Directors of Sun since 1993 and Sun's CEO since 1994.  He is employed at Sun's headquarters in Southfield, Michigan, and resides in West Bloomfield, Michigan.

9.     Mary A. Petrella ("Petrella") was Sun's Controller from 1995 until November 2002.  She is currently employed in the Operations Department at Sun's headquarters in Southfield, Michigan, and resides in Rochester Hills, Michigan.  Petrella is a registered accountant in Michigan.

## SUN AND RELEVANT SUBSIDIARIES

10.     Sun, a Maryland corporation, is a real estate investment trust (REIT) headquartered in Southfield, Michigan.  Through various subsidiaries, Sun owns, operates, develops and finances manufactured housing communities located primarily in the midwestern and southeastern United States.  Sun has been a public company since 1993.  Sun's common stock is registered with the Commission pursuant to Section 12(b)

of the Exchange Act [15 U.S.C. § 78l(b)] and is traded on the New York Stock Exchange.

11. Sun Communities Operating Limited Partnership ("SCOLP"), a Michigan limited partnership, is Sun's main operating subsidiary. Sun is the sole general partner of SCOLP and holds a controlling interest in SCOLP.

12. Sun/Forest Holdings, LLC ("Sun/Forest Holdings"), a Michigan limited liability company, is a subsidiary of SCOLP, which holds a controlling interest in Sun/Forest Holdings.

13. Sun/Forest, LLC ("Sun/Forest"), a Michigan limited liability company, is a subsidiary of Sun/Forest Holdings, which holds a majority interest in Sun/Forest.

14. Sun's interest in the SunChamp joint venture is held through its primary subsidiary SCOLP, and then through its secondary and tertiary subsidiaries Sun/Forest Holdings and Sun/Forest. References herein to Sun's interests in SunChamp reflect Sun's share of the interests of SCOLP, Sun/Forest Holdings, and Sun/Forest.

15. At all times relevant to this case, Sun's financial statements and reports included the financial results for SCOLP, Sun/Forest Holdings, and Sun/Forest on a consolidated basis.

## THE SUNCHAMP JOINT VENTURE

16. Champion Enterprises, Inc. ("Champion Enterprises"), a Michigan corporation, is a manufacturer of factory-built housing. Through various subsidiaries, Champion Enterprises has engaged in joint ventures involved in the development and management of manufactured home communities. The term "Champion" as used herein

4

refers to Champion Enterprises and the Champion Enterprises subsidiaries associated with the SunChamp joint venture.

17. SunChamp, a Michigan limited liability company, is a joint venture formed in 1999 by Sun and Champion. SunChamp acquires land, improves it for use as homesites, and leases the sites to individuals who have purchased mobile homes. SunChamp incurred losses each year through at least 2002.

18 When SunChamp was formed in 1999, Sun held a 75% interest in SunChamp, while Champion held a 25% interest.

## SUN'S RECORD-KEEPING AND REPORTING OBLIGATIONS

19. As a public company with securities registered with the Commission, Sun is required to file quarterly and annual reports with the Commission. These reports must accurately and completely portray the results of Sun's operations and Sun's financial condition. Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

20. Financial statements submitted by Sun to the Commission must be prepared in accordance with generally accepted accounting principles ("GAAP"). 17 C.F.R. § 210.4-01.

21. GAAP provisions specify how an investor must account for its share of the profits or losses from a joint venture or similar investment. If the investor has the ability to exercise significant influence over the investment, the investor must use the "equity method" of accounting. Accounting Principles Board Opinion No. 18 (March 1971)("APB 18") at ¶¶ 2c & 17. If the investor owns 20% or more of the investment, the investor is presumed to have the ability to exercise significant influence over the

investment. If an investor owns less than 20% but exerts significant influence over the investment, the equity method is still required. APB 18 at ¶17. Under the equity method, as the investment generates earnings or losses, the investor's share of those earnings or losses must be reflected in the investor's income statement and the balance sheet adjusted correspondingly. APB 18 at ¶17.

22.    Where the investor does not have the ability to exercise significant influence over the investment, GAAP provisions require that the "cost method" be used to account for the investor's return. Under the cost method, gains or losses are not recognized until the sale (or "other than temporary impairment") of the investment. APB 18 at ¶ 6a.

23.    The equity method is the preferred method for use in connection with corporate joint ventures such as SunChamp. APB 18 ¶ 16; Statement of Position 78-9 (December 1974) ("SOP 78-9") at ¶¶ 4-5.

## FAILURE TO PROPERLY REPORT THE SUNCHAMP LOSSES ATTRIBUTABLE TO SUN

24.    At Jorissen's direction, Sun failed to properly account for and report its share of SunChamp's losses for each quarter from January 1, 2000, through September 30, 2002, and for end of year 2000, 2001, and 2002.

### A.    1st and 2nd Quarter 2000;  "90-Day Lag"

25.    Sun adopted the equity method of accounting for SunChamp's losses during the first quarter of 2000.  However, at Jorissen's direction, Sun improperly employed a "90-day lag" in recording the SunChamp results, holding the SunChamp figures until the next quarter.  Sun failed to report any of SunChamp's first quarter losses in Sun's first quarter financial statements.

26.     Sun's proportionate share of the SunChamp losses for the first quarter of 2000 was approximately $441,000 (before adjustment for minority interests). Because these losses were not included in Sun's financial reports for this quarter, Sun's net income for the first quarter of 2000 was overstated by approximately 4%. Sun's Form 10-Q for the first quarter of 2000, filed with the Commission in May 2000, incorporated Sun's financial statements containing this overstatement.

27.     Sun's share of SunChamp's losses for the second quarter was approximately $824,000. Pursuant to Jorissen's "90-day lag" policy, Sun's financial statement for the second quarter failed to report this $824,000 loss. Instead, Sun reported a portion of SunChamp's first quarter losses (approximately $251,000 rather than the full $441,000). As a result, Sun misstated its share of SunChamp's losses for the second quarter by approximately $573,000, resulting in overstatement of Sun's net income for the quarter of approximately 5%. Sun's 10-Q for the second quarter of 2000, filed in August 2000, incorporated this overstatement.

28.     At Jorissen's direction, Sun improperly switched from the equity method to the cost method for the third quarter of 2000 and did not report any SunChamp losses for the third quarter of 2000. The $824,000 SunChamp loss attributable to Sun for the second quarter of 2000 was never reported.

29.     Under the equity method, an investor must account for its share of earnings or losses based on the "latest available financial statement" regarding the investment. APB 18 at ¶ 19. An investor may not delay accounting for its share of losses if the necessary information is known or reasonably available. Sun's 90-day lag in reporting was unjustified and contrary to GAAP because the information required to report these

7

losses on a timely basis was known or readily available. SunChamp's financial statements for these two quarters were available before Sun's quarterly reports were due at the Commission and could readily have been accounted for in Sun's statements. Sun's joint venture partner, Champion, reported its share of SunChamp's losses for these quarters on a timely basis.

30. In March 2000, before the end of the first quarter of 2000, Jorissen and Petrella were advised by Sun's outside auditor, accountant Gregory Nelson, that "real time reporting" was a "hot button with the SEC" in light of earnings management issues.

31. In response to this warning, Jorissen told Nelson, directly or through Petrella, that Sun needed to adopt a 90-day lag because SunChamp was not providing the necessary information in time to allow Sun to reflect that information in its quarterly filings. This statement was materially false or misleading.

32. Jorissen knowingly or recklessly disregarded GAAP requirements in directing that Sun implement the "90-day lag" policy.

**B. 3rd Quarter 2000 Through End Of 2001: Failure To Use Equity Method**

33. At Jorissen's direction, for the third quarter of 2000 Sun improperly switched to the cost method in accounting for its share of SunChamp's losses and then continued to use the cost method for six quarters, through the end of 2001. During this period Sun's financial statements did not reflect any of SunChamp's losses.

**Sun's Influence Over SunChamp**

34. Sun's use of the cost method was contrary to GAAP because Sun exercised significant influence over the SunChamp joint venture. Through its subsidiaries, Sun held half of the seats on the equivalent of SunChamp's board of

8

directors and played a key role in setting SunChamp policy. Under the SunChamp Operating Agreement, Sun was also the "Manager" of the joint venture, vested with "full power and complete authority and discretion to manage and control the company and its business and to make all incidental decisions" (subject to restrictions relating to dissolutions, mergers, and other corporate matters). Further, Sun approved SunChamp's operating and construction budgets and all new acquisitions. SunChamp was also financially dependent on Sun, which was to provide 50% of SunChamp's operating shortfalls and development overruns, and 75% of SunChamp's budgeted capital costs.

**Misuse Of 20% Ownership Guideline**

35.    Despite Sun's significant influence over SunChamp, Jorissen improperly directed that beginning with the third quarter of 2000, Sun would use the cost method of accounting, thus excluding SunChamp's losses from Sun's financial statements on an ongoing basis. This decision was based on Jorissen's determination that as of July 1, 2000, Sun's interest in SunChamp fell below 20% because on that date Sun transferred portions of its interest to outside investors. In making this determination, Jorissen knowingly or recklessly disregarded the GAAP requirement that due to Sun's significant influence over SunChamp, Sun was required to use the equity method, and account for its share of SunChamp's losses, even if Sun's interest in SunChamp had actually fallen below 20%.

**Transactions With Outside Investors**

36.    In September 2000 Sun transferred an interest in SunChamp to T.J. Holdings for $3.2 million. In October 2000 Sun transferred an interest in SunChamp to Jerome Schostak ("Schostak") for $2 million in cash and $4 million in non-recourse

promissory notes. In July 2001 Sun transferred interests in SunChamp to Steven Friedman ("Friedman") and Michael Horowitz ("Horowitz") for a total of $2 million in cash and $4 million in non-recourse notes.

37.     Sun's transactions with T.J. Holdings, Schostak, Friedman, and Horowitz should not have been treated as reductions in Sun's ownership interest in SunChamp for purposes of determining the amount of equity method loss. These transactions did not transfer the risks and rewards of ownership for accounting purposes, and therefore did not qualify as "sales" of equity interests under APB 18, SOP 78-9, and FAS 66.

38.     For purposes of GAAP accounting, the sale of an investment in a real estate venture must be evaluated under FAS 66. SOP 78-9 at ¶ 39; Emerging Issues Task Force No. 98-8 (May 21, 1998). Pursuant to FAS 66, profit or loss on a real estate sales transaction may not be recognized for accounting purposes until: (i) a sale is consummated; (ii) the buyer's initial and continuing investments demonstrate a commitment to pay for the property; (iii) the seller's receivable is not subject to future subordination; and (iv) the seller has transferred the usual risks and rewards of ownership and does not have a substantial continuing involvement with the property. FAS 66 at ¶ 5.

39.     GAAP provisions also require that joint venture losses otherwise allocable to outside investors must be reported by the primary investor if it is probable that the outside investors will not fund their share of any shortfalls incurred by the joint venture. SOP 78-9. In Sun's case, the outside investors were unlikely to fund (and ultimately did not fund) SunChamp's shortfalls.

40.     Three of Sun's transactions with outside investors (the Schostak, Friedman, and Horowitz transactions) did not satisfy the FAS 66 requirement that the

buyer's continuing investment must be "adequate to demonstrate a commitment to pay for the property." Most of the payment due from these investors was reflected in non-recourse promisory notes. If the outside investors failed to pay the notes when due, Sun's sole recourse was to look to the investors' interests in SunChamp. Under FAS 66, this was inadequate to demonstrate "a commitment to pay for the property" over and above the initial cash payment.

41.    Sun's transactions with the outside investors also failed to satisfy the FAS 66 requirement that the seller must not have "a substantial continuing involvement with the property." Sun retained a substantial continuing involvement with SunChamp and, indirectly, with the ownership interests transferred to the individual investors. After these "sales" transactions, Sun continued to have the same high level of involvement in SunChamp as before. Additionally, Sun had the right to repurchase certain SunChamp properties under specified conditions. In contrast, the outside investors played no role in the operations of SunChamp.

42.    Sun's interest in SunChamp should have been reported as substantially greater than 50% throughout the entire period from January 1, 2000 through December 31, 2002. Nevertheless, Jorissen knowingly or recklessly disregarded GAAP requirements by directing that Sun reduce its stated ownership interest in SunChamp below 20% and on that basis exclude SunChamp's losses from Sun's financial statements.

**Misrepresentations As To Dates Of "Sales" To Investors**

43.    At Jorissen's direction, Sun also prematurely recognized the purported sales to Schostak, Friedman, and Horowitz, treating these transactions as consummated well before they closed. Under FAS 66, a sale is not consummated until (i) the parties

11

are bound by the terms of a contract, (ii) all consideration has been exchanged, (iii) any permanent financing for which the seller is responsible has been arranged, and (iv) all conditions precedent to closing have been performed. These four conditions are usually met at the time of the closing, or after the closing. FAS 66 at ¶ 6.

44.     There was no letter of intent as to the Schostak transaction until October 6, 2000, and the transaction did not close until October 26, 2000. Nevertheless, at Jorissen's direction, Sun recorded this transaction as consummated on July 1, 2000, and on this basis directed that Sun switch to the cost method of accounting as of that date. By July 1 there had been no binding contract, no exchange of consideration, and no arrangement of financing. Moreover, the Sun subsidiary in which Schostak was purchasing ownership (Sun/Forest Holdings) did not exist as of July 1, 2000.

45.     When closing Sun's books for the first quarter of 2001, Jorissen spoke with Shiffman about the benefits to Sun if Sun's interest in SunChamp was below 20%. Shiffman then falsely stated to Jorissen that agreements had already been finalized to transfer portions of Sun's interest in SunChamp to Friedman and Horowitz. Based on Shiffman's statement, Jorissen directed that the "sales" to Friedman and Horowitz be accounted for as if they had been consummated on January 1, 2001.

46.     By January 1, 2001, neither Friedman nor Horowitz had agreed to purchase an interest in SunChamp. The Friedman and Horowitz transactions were not closed until July 3, 2001. Shiffman caused the falsification of Sun's books and records by falsely stating to Jorissen in early 2001 that agreements with Friedman and Horowitz had already been finalized.

**C.**     **First Three Quarters Of 2002: Improper Equity Method Accounting**

47.     During the first three quarters of 2002, Sun adopted the equity method to report on SunChamp losses. As a result, Sun did report certain SunChamp losses during these quarters. However, during this period Jorissen continued to knowingly or recklessly disregard GAAP requirements with regard to recognition of SunChamp's losses. At Jorissen's direction, Sun continued to calculate its share of the SunChamp losses as if its ownership interest in SunChamp had been reduced by the purported sold to T.J. Holdings, Schostak, Friedman, and Horowitz in 2000 and 2001. This resulted in Sun reporting a smaller portion of the SunChamp losses than required by GAAP.

48.     On December 3, 2002, Sun purchased Champion's ownership interest in SunChamp. Sun consolidated SunChamp on its balance sheet as of that date but, contrary to GAAP requirements, did not consolidate SunChamp on its income statement until January 1, 2003.

**D.**     **Misstatements In SEC Filings**

49.     As a result of Sun's failure, at Jorissen's direction, to properly account for its share of SunChamp's losses, Sun materially overstated its income in its quarterly reports (Form 10-Q) and annual reports (Form 10-K) filed with the SEC for each reporting period from January 1, 2000 through September 30, 2002, and in the annual report for 2002, filed in early 2003.

50.     The amount of Sun's overstatement of income for each reporting period is listed below, as identified by the Commission based on Sun's income before consideration of minority interests. (For the third quarter of 2000 through the third

quarter of 2002, these figures reflect adjustments relating to interest receivable from outside investors.)

| Period | Income Overstatement | Overstatement Percentage |
|--------|----------------------|--------------------------|
| Q1 2000 | $441,000 | 4.42% |
| Q2 2000 | 573,000 | 5.83% |
| Q3 2000 | 1,168,000 | 8.55% |
| Q4 2000 | 1,496,000 | 16.33% |
| FYE 2000 | 3,678,000 | 8.63% |
| | | |
| Q1 2001 | 1,020,000 | 7.42% |
| Q2 2001 | 1,163,000 | 11.10% |
| Q3 2001 | 1,067,000 | 10.59% |
| Q4 2001 | 1,402,000 | 16.96% |
| FYE 2001 | 4,652,000 | 10.93% |
| | | |
| Q1 2002 | 734,000 | 7.01% |
| Q2 2002 | 854,000 | 9.36% |
| Q3 2002 | 1,155,000 | 15.51% |
| Q4 2002 | ---- | ---- |
| FYE 2002 | 2,708,000 | 13.09% |

51.     During the period from January 2000 through the end of 2002, Sun also filed with the SEC numerous registration statements, prospectuses and other non-periodic reports, many of which incorporated Sun's quarterly (10-Q) and annual (10-K) reports containing false financial statements. For example, on October 23, 2001, Sun filed an amendment to a Form S-3 securities offering wherein Sun offered debt securities, preferred stock, common stock, and warrants. That filing incorporated Sun's 10-K for 2000 and Sun's 10-Qs for the first and second quarter of 2001 (and all future 10-Ks and 10-Qs until the securities were sold). On March 5, 2002, Sun filed another amendment relating to the securities identified in the October 2001 filing, incorporating its 10-K for

2000 and 10-Qs for the first three quarters of 2001. This offering remained in place through 2002.

<strong>COOKIE JAR RESERVES AND EARNINGS MANAGEMENT</strong>

52.     At Jorissen's direction, Sun improperly maintained general or "cookie jar" reserves and used these reserves to "smooth" earnings. Under GAAP, a reserve can be established only in response to an identified loss contingency and only if exposure to the liability is probable and the loss can be reasonably estimated. See FASB Concepts Statement No. 6; Statement of Financial Accounting Standards No. 5 ("FAS 5"). The creation of general reserves is expressly prohibited under GAAP. See FAS 5 at ¶14.

53.     Jorissen knowingly or recklessly violated GAAP, falsified Sun's accounting records, and circumvented Sun's internal controls by establishing and using a general reserve. In the first quarter of 2001, Jorissen used an existing account (Account 2020, "Accrued Expenses") to establish a reserve for a $250,000 general contingency associated with Sun's sale of property in Florida. This reserve was designated as "reserve for cost." Because Sun's exposure to a loss contingency associated with the Florida sale was not probable and was not reasonably estimable, this $250,000 reserve violated FAS 5 and constituted a misstatement of net income on Sun's financial statements.

54.     Further, Jorissen and Petrella knowingly or recklessly violated GAAP, falsified Sun's accounting records, and circumvented Sun's internal controls by releasing portions of this general reserve for reasons unrelated to the contingency for which the reserve was created. Under GAAP, a reserve can be released only when the related liability has been extinguished. Statement of Financial Accounting Standards No. 140 ("FAS 140") at ¶ 16. Just as there was no valid obligation when Jorissen established the

$250,000 general reserve, there was no basis for later recording a termination of portions of this reserve.

55.     On July 31, 2001, at Jorissen's direction, the general reserve in Account 2020 was reduced by $81,365 to account for what Sun described as the "Schostak interest income adjustment." This entry was unrelated to any purpose for which the reserve was created. The remaining balance of the general reserve was approximately $169,000.

56.     On August 23, 2001, at Jorissen's direction, Sun again improperly released a portion of the general reserve in Account 2020. On that date Petrella asked Jorissen via email how to treat a $50,000 invoice arising from settlement of a lawsuit unrelated to the contingency for which the reserve was created. Petrella's e-mail noted that one option was to "reduce the $250,000 cookie jar you created in the first qtr FL property sales." Petrella also noted that a second option involved "more PWC exposure . . . but the staff auditor would have to select this addition in a random sample to understand the details." Petrella indicated that she was "[n]ot sure what you have in mind for the cookie jar which is now reduced to $169,000 . . . ," and asked Jorissen how the $50,000 should be treated. Minutes later Jorissen responded that she should "use cookie jar." Petrella then reduced the general reserve in Account 2020 by $50,000. This reduction in the general reserve was a knowing or reckless falsification of Sun's financial books and records, and a circumvention of Sun's internal controls, by Jorissen and Petrella.

57.     Jorissen and Petrella also improperly used the general reserve to record entries that matched expenses to seasonal revenue. Sun incurred Property Operating and Maintenance ("POM") expenses throughout the year at certain recreational vehicle communities, while revenue from these communities was seasonal. To smooth earnings,

Sun recorded in one quarter the POM expenses incurred throughout the year. Sun netted the annual expenses against the seasonal revenue, a clear violation of GAAP. For the first quarter of 2000, Sun recorded $365,000 in POM expenses in Account 2020 and released that amount in the second quarter of 2000. For the first quarter of 2001, Sun recorded $250,000 in POM expenses in Account 2020 and released that amount in the second quarter of 2001. For the first quarter of 2002, Sun recorded $300,000 in POM expenses in Account 2020 and released that amount for the second quarter of 2002. By directing and implementing Sun's use of a general reserve to smooth earnings in violation of GAAP, Jorissen and Petrella knowingly or recklessly falsified Sun's financial books and records and circumvented Sun's internal controls.

### FIRST CLAIM FOR RELIEF

**Violations of Sections 17(a)(2) and (3) of the Securities Act
(Jorissen)**

58.     The Commission incorporates paragraph 1 through 57 with the same force and effect as if set out here.

59.     Pursuant to Section 17(a)(2) and (3) of the Securities Act [15 U.S.C § 77q(a)(2) and (3)], it is unlawful for any person, in connection with the offer or sale of securities and using the means or instruments of transportation or communication in interstate commerce or the mails, to (i) obtain money or property by means of an untrue statement of a material fact or an omission of a material fact necessary to make a statement not misleading, or (ii) engage in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser of securities.

60.     In the manner described in paragraphs 1 through 57, defendant Jorissen, in connection with the offer or sale of securities issued by Sun and using the means or

instrumentalities of interstate commerce and the mails (i) obtained money or property by means of untrue statements of material fact regarding Sun's financial performance and condition, and (b) engaged in transactions and practices which operated as a fraud on purchasers of Sun's securities.

61.    By reason of the foregoing, defendant Jorissen violated, and unless restrained will continue to violate, Section 17(a)(2) and (3).

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Sun's Violations of Reporting Requirements (Jorissen)

62.    The Commission incorporates paragraphs 1 through 57 with the same force and effect as if set out here.

63.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] require every issuer of a registered security to file with the Commission reports that accurately reflect the issuer's financial performance.

64.    Sun violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 by filing quarterly reports (Form 10-Q) for each quarter from January 1, 2000, through September 30, 2002, and annual reports (Form 10-K) for the years 2000, 2001, and 2002 that did not accurately reflect Sun's financial performance. As described in paragraphs 1 through 57 above, these reports incorporated Sun financial statements that were not in compliance with GAAP and contained material misstatements.

65.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] whoever "knowingly provides substantial assistance" to another person in connection with a violation of the Exchange Act, or any regulation thereunder, is deemed to be "in

violation of such provision to the same extent as the person to whom such assistance is provided."

66.    In the manner described in paragraphs 1 through 57, Jorissen knowingly provided substantial assistance to Sun in connection with Sun's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13.  Jorissen aided and abetted Sun's reporting violations within the scope of Section 20(e) and thus violated Section 13(a) and Rules 12b-20, 13a-1 and 13a-13 to the same extent as Sun.

67.    Unless restrained, Jorissen will continue to aid and abet violations of these reporting provisions.

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Sun's Violations of
Sections 13(b)(2)(A) and (B) of the Exchange Act
(Jorissen)**

68.    The Commission incorporates paragraphs 1 through 57 with the same force and effect as if set out here.

69.    Pursuant to Section 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. § 78m(b)(2)], every issuer of a registered security must (i) maintain books and records accurately and fairly reflecting its transactions and the disposition of its assets, and (ii) establish a system of internal accounting controls that provides reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

70.    As described in paragraphs 1 through 57 above, Sun violated Section 13(b)(2)(A) and (B) of the Exchange Act throughout the period from January 1, 2000, to September 30, 2002, and in connection with its annual reports for the years 2000, 2001, and 2002, by failing to (i) maintain books and records accurately and fairly reflecting its

transactions and the dispositions of its assets, and (ii) establish a system of internal accounting controls that provides reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

71. Pursuant to Section 20(e) of the Exchange Act whoever "knowingly provides substantial assistance" to another person in connection with a violation of the Exchange Act, or any regulation thereunder, is deemed to be "in violation of such provision to the same extent as the person to whom such assistance is provided."

72. In the manner described in paragraphs 1 through 57, Jorissen knowingly provided substantial assistance to Sun in connection with Sun's violations of Section 13(b)(2)(A) and (B) of the Exchange Act. Jorissen aided and abetted Sun's record-keeping and internal control violations within the scope of Section 20(e) and thus violated Section 13(b)(2)(A) and (B) to the same extent as Sun.

73. Unless restrained, Jorissen will continue to aid and abet violations of these record-keeping and internal control provisions.

## FOURTH CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of the Exchange Act
### (Jorissen and Petrella)

74. The Commission incorporates paragraphs 1 through 57 with the same force and effect as if set out here.

75. Pursuant to Section 13(b)(5) of the Exchange Act, no person may knowingly circumvent or fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account maintained pursuant to Section 13(b)(2) of the Exchange Act.

76. In the manner described in paragraphs 52 through 57, defendants Jorissen and Petrella knowingly circumvented Sun's internal accounting controls and knowingly falsified books, records, and accounts maintained by Sun pursuant to Section 13(b)(2) of the Exchange Act.

77. By reason of the foregoing, defendants Jorissen and Petrella violated, and unless restrained will continue to violate, Section 13(b)(5) of the Exchange Act.

## FIFTH CLAIM FOR RELIEF

### Violations of Rule 13b2-1 Under the Exchange Act
### (Jorissen, Shiffman, and Petrella)

78. The Commission incorporates paragraphs 1 through 57 with the same force and effect as if set out here.

79. Rule 13b2-1 issued under the Exchange Act [17 C.F.R. § 240.13b2-1] provides that no person shall directly or indirectly falsify any book, record, or account subject to Section 13(b)(2)(A) of the Exchange Act.

80. In the manner described in paragraphs 43 through 46, defendants Jorissen and Shiffman, falsified or caused the falsification of books, records, and accounts maintained by Sun and subject to Section 13(b)(2)(A) of the Exchange Act.

81. In the manner described in paragraphs 52 through 57, defendants Jorissen and Petrella, falsified or caused the falsification of books, records and accounts maintained by Sun and subject to Section 13(b)(2)(A) of the Exchange Act.

82. By reason of the foregoing, defendants Jorissen, Shiffman, and Petrella violated, and unless restrained will continue to violate, Rule 13b2-1 of the Exchange Act.

## SIXTH CLAIM FOR RELIEF

### Violations of Rule 13b2-2 of the Exchange Act
### (Jorissen)

83.     The Commission incorporates paragraphs 1 through 57 with the same force and effect as if set out here.

84.     Rule 13b2-2 of the Exchange Act  [17 C.F.R. § 240.13b2-2] provides, inter alia, that no director or officer of an issuer may, directly or indirectly, make or cause to be made a materially false or misleading statement to an accountant in connection with the preparation or filing of any document or report required to be filed with the Commission.

85.     In the manner described in paragraphs 25 through 32, defendant Jorissen violated Rule 13b2-2 by making or causing to be made a materially false or misleading statement to Sun's auditor, Gregory Nelson, in connection with the preparation of Sun's financial statements and Sun's quarterly reports (Form 10-Q) for the first and second quarter of 2001.  Jorissen indicated to Nelson, directly or indirectly, that Sun needed to adopt a 90-day lag in reporting its share of SunChamp's losses because SunChamp was not providing the necessary information in time to allow Sun to reflect that information in Sun's quarterly filings.  This statement was false or misleading.

86.     Unless restrained, Jorissen will continue to violate Rule 13b2-2.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that the Court enter judgment:

(a) permanently enjoining Jorissen from violating Section 17(a)(2) and (3) of the Securities Act, Section 13(b)(5) of the Exchange Act, and Rules 13b2-1 and 13b2-2 of the Exchange Act, and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder; requiring him to disgorge his ill-gotten gains with prejudgment interest; and requiring him to pay a civil penalty;

(b) permanently enjoining Shiffman from violating Rule 13b2-1 of the Exchange Act, and requiring him to pay a civil penalty; and

(c) permanently enjoining Petrella from violating Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, and requiring her to pay a civil penalty; and

(d) providing such other relief as may be appropriate.

Dated: February **26**, 2006

H. Michael Semler
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Tel: 202-551-4429
Fax: 202-772-9246

Attorney for Plaintiff

Of Counsel:
Peter Bresnan
Cheryl Scarboro
Bernard McDonough
Securities and Exchange
 Commission

Local Counsel:
Ellen Christensen
Assistant United States Attorney
211 W. Fort Street
Suite 201
Detroit, Michigan 48226-3211
Tel: 313-226-9112
Fax: 313-226-3800

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET
County in which this action arose   Oakland

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
U.S. SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
JEFFREY P. JORISSEN, GARY A. SHIFFMAN AND MARY A. PETRELLA

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Oakland
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
H. Michael Semler, U.S. Securities and Exchange Commission,
100 F Street, N.E., Washington, D.C. 20549
202-551-4429

Attorneys (If Known)
SEE ATTACHED

## II. BASIS OF JURISDICTION   (Select One Box Only)

☑ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Select One Box for Plaintiff
(For Diversity Cases Only)                            and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Select One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | Determination Under |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Access to Justice |
| | Employment | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | State Statutes |
| | Other | | | | |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Select One Box Only)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. sec. 77q(a)(2) & (3); 15U.S.C. secs. 78m(b)(2);78m(b)(5) & 78m(a);17 C.F.R. secs. 240.13b2-1, 13b 2-2, 12b-20, 13a-1 & 13a-13
Brief description of cause:
Violations of anti-fraud and reporting provisions of the federal securities laws.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☑ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
February 26, 2006

SIGNATURE OF ATTORNEY OF RECORD
H. [signature]

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.      Is this a case that has been previously dismissed?      ☐ Yes    ☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.      Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)      ☐ Yes    ☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :

SEC v. JEFFREY P. JORISSEN, GARY A. SHIFFMAN AND
MARY A. PETRELLA

COUNSEL LIST FOR DEFENDANTS
Counsel for Jeffrey Jorissen:
J. Bradley Bennett, Esq.
Baker Botts LLP
The Warner
1299 Pennsylvania Ave., NW
Washington, D.C.  20004-2400

Counsel for Gary Shiffman:
John Sturc, Esq.
Mark A. Perry, Esq.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036

Counsel for Mary A. Petrella:
Richard Carl Sauer, Esq.
Vinson & Elkins LLP
The Willard Office Building
1455 Pennsylvania Avenue, NW
Suite 600
Washington, DC  20004-1008